IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

BARBARA DAVIS o/b/o )
DAVID DAVIS, deceased, )
 )
       Plaintiff, )
 )
       v. )     Case No.
 )     15-4170-CV-C-REL-SSA
CAROLYN W. COLVIN, Acting )
Commissioner of Social Security, )
 )
       Defendant. )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff David Davis sought review of the final decision of the Commissioner of

Social Security denying plaintiff's application for disability benefits under Titles II and

XVI of the Social Security Act ("the Act"). I find that the substantial evidence in the

record as a whole supports the ALJ's finding that plaintiff was not disabled. Therefore,

plaintiff's motion for summary judgment will be denied and the decision of the

Commissioner will be affirmed.

## I.    BACKGROUND

On June 20, 2012, plaintiff applied for disability benefits alleging that he had

been disabled since September 1, 2009. Plaintiff's disability stemmed from shortness

of breath, congestive heart failure, coronary artery disease, chronic obstructive

pulmonary disease ("COPD"), hypertension, high cholesterol, and dizziness. Plaintiff's

application was denied on July 23, 2012. On December 18, 2013, a hearing was held

before an Administrative Law Judge. On February 10, 2014, the ALJ found that plaintiff

was not under a "disability" as defined in the Act. On June 24, 2015, the Appeals

Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.     STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the

2

courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.   BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

Yes = not disabled.
No = go to next step.

2.     Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.     Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.     Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5.     Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.     THE RECORD

The record consists of the testimony of plaintiff and vocational expert Denise Weaver in addition to documentary evidence admitted at the hearing.

## A.     ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record establishes that plaintiff earned the following income from 1976 through 2013, shown in both actual and indexed figures:

| Year | Actual Earnings | Indexed Earnings |
|------|-----------------|------------------|
| 1976 | $ 404.80 | $ 1,772.74 |
| 1977 | 552.00 | 2,280.69 |
| 1978 | 1,392.00 | 5,328.18 |

4

| | | |
|---|---:|---:|
| 1979 | 1,693.59 | 5,961.11 |
| 1980 | 3,278.66 | 10,586.67 |
| 1981 | 6,907.98 | 20,265.61 |
| 1982 | 6,913.81 | 19,224.37 |
| 1983 | 7,374.31 | 19,552.32 |
| 1984 | 8,440.61 | 21,137.00 |
| 1985 | 8,428.51 | 20,244.18 |
| 1986 | 5,461.43 | 12,739.52 |
| 1987 | 8,632.44 | 18,929.13 |
| 1988 | 7,721.16 | 16,136.16 |
| 1989 | 8,279.00 | 16,643.01 |
| 1990 | 6,723.00 | 12,918.31 |
| 1991 | 6,170.00 | 11,429.78 |
| 1992 | 6,271.88 | 11,049.21 |
| 1993 | 8,205.78 | 14,332.91 |
| 1994 | 10,947.54 | 18,622.10 |
| 1995 | 11,067.07 | 18,099.91 |
| 1996 | 9,859.12 | 15,372.54 |
| 1997 | 13,293.41 | 19,584.58 |
| 1998 | 13,080.92 | 18,313.05 |
| 1999 | 12,067.70 | 16,002.75 |
| 2000 | 12,905.74 | 16,217.25 |
| 2001 | 14,538.13 | 17,842.83 |
| 2002 | 15,198.89 | 18,648.57 |
| 2003 | 13,228.89 | 15,691.19 |
| 2004 | 13,010.28 | 14,746.37 |
| 2005 | 0.00 | 0.00 |
| 2006 | 2,244.00 | 2,345.84 |
| 2007 | 3,970.90 | 3,970.90 |
| 2008 | 2,194.00 | 2,194.00 |
| 2009 | 2,452.00 | 2,452.00 |
| 2010 | 0.00 | 0.00 |
| 2011 | 0.00 | 0.00 |
| 2012 | 0.00 | 0.00 |
| 2013 | 0.00 | 0.00 |

Case 2:15-cv-04170-REL   Document 38   Filed 09/30/16   Page 5 of 36

(Tr. at 199-200, 213-214, 234-235).

**Function Report**

In a Function Report dated July 13, 2012, plaintiff indicated that he spends his day watching television, feeding his animals, doing yard work, driving his mother or others to appointments, doing dishes, vacuuming, doing laundry, and watching movies (Tr. at 266). He watches his grandchildren, which includes "all aspects of care" (Tr. at 267). He feeds, waters, cleans up after, and bathes his animals (Tr. at 267). He occasionally has problems sleeping due to breathing problems and pain in his hip and back (Tr. at 267). He has no problems with personal care (Tr. at 267). He prepares his own meals, including "full meals, complete meals, many courses/dishes" (Tr. at 268). He does this daily, and his ability to prepare meals has not been affected by his condition (Tr. at 268). He is able to do some mowing, weed eating, any household chores, dishes, laundry, sweeping (Tr. at 268). He does these things regularly and without assistance (Tr. at 268). Plaintiff is able to go out alone, and when he does he either walks, drives or rides in a car (Tr. at 269). He shops in stores weekly (Tr. at 269). His hobbies including hunting, fishing, working on vehicles, watching television and watching movies (Tr. at 270). He cannot walk as far when he hunts or goes on fishing trips because of trouble breathing and pain (Tr. at 270). He goes to visit friends and relatives, goes to cook-outs and dinners, goes to help friends and family with things (Tr. at 270). When asked to list the places he goes on a regular basis, plaintiff wrote, "stores, family members' homes/friends' homes, children/grandchildren's events (ex., b-day parties, ball games, etc.)" (Tr. at 270). When asked how often he does these

6

things and how much he takes part in the activities, he wrote, "Daily/weekly, as much as possible or needed" (Tr. at 270).

Plaintiff's impairments affect his ability to lift, squat, bend, stand, walk, sit, kneel, hear, climb stairs, see, and use his hands (Tr. at 271). His impairments do not affect his ability to reach, remember, complete tasks, concentrate, understand, follow instructions, or get along with others (Tr. at 271). When plaintiff goes hunting, he needs to take frequent breaks of 10 to 15 minutes or more (Tr. at 271).

**B.    SUMMARY OF TESTIMONY**

During the December 18, 2013, hearing, plaintiff testified; and Denise Weaver, a vocational expert, testified at the request of the ALJ.

**1.    Plaintiff's testimony.**

Plaintiff drove 86 miles from his home to the administrative hearing (Tr. at 43). It took about an hour and a half (Tr. at 43). If he starts to have a dizzy spell while he is driving, he pulls over (Tr. at 44). He had not had a dizzy spell in the past couple days, but a few days before the hearing he had six of them in one day (Tr. at 44). When he has a dizzy spell, he sits down and lets it pass (Tr. at 44).

Plaintiff quit school in 12th grade and never got a GED (Tr. at 79). He lives on 15 acres with his mother (Tr. at 54). His mother owns the property and has a residence there, and she bought a trailer and put it on her land about 150 yards from her house, which is where plaintiff lives with his second wife and his daughter from his first marriage (Tr. at 55). Plaintiff's wife is trying to get disability (Tr. at 55). His daughter is 16 (Tr. at 55). She has a smart phone, and her mother pays for it (Tr. at 56). Plaintiff's

daughter does not participate in sports, singing, band, or clubs, so plaintiff does not go watch her do anything at school (Tr. at 60). He does go to parent-teacher conferences (Tr. at 60).

Plaintiff worked for Professional Management Group doing ground maintenance, swimming pool maintenance, and minor maintenance work at a condominium complex for nine and a half years (Tr. at 75). He stopped doing that job after he was laid off (Tr. at 76).

Plaintiff started his own business in 2009 (his alleged onset date is September 1, 2009) (Tr. at 45). His health started going downhill and the economy went downhill and he had to let his employees go (Tr. at 45). He could not do the work by himself (Tr. at 45). Plaintiff's past work was as a laborer, which is pretty heavy work (Tr. at 69). He stopped working in 2009 because there was no work (Tr. at 70). "Last job I had was for a landscaping company. And when he hired me, he goes he just needed me to get him over the spring hump. And, I worked for him, and one morning I was heading [to] work, and [he] called and said that he was done with me. And that's when I started my own landscaping business and done it for about three years, and, but it was just, the more work I done, the worse I felt." (Tr. at 70). Plaintiff's last job working for someone else was in 2008, and he lost that job because he was no longer needed, not because of his impairments (Tr. at 71). He started his own business in 2009 (Tr. at 71). At first he was making at least $1,000 a month, but the economy was bad and he was only getting "itty-bitty" jobs (Tr. at 72). In about 2011, he had to stop doing those little jobs because of his back and hip -- the bouncing of the riding lawn mower bothered him too much (Tr.

8

at 72-73). While plaintiff had this business, his wife used the gas powered weed whacker except on steep hills -- plaintiff did those (Tr. at 73). His wife did the trimming (Tr. at 73).

Plaintiff last reported earnings in 2009, but he worked in 2010 and 2011 mowing yards, he just didn't make enough money to report it (Tr. at 71).

Plaintiff has not been to the doctor a lot in the last several years because he could not afford it (Tr. at 46). He recently got Medicaid coverage and is now going to the doctor (Tr. at 46). Plaintiff was having chest pain in 2010 and at the time was smoking two packs of cigarettes per day (Tr. at 46). He is still smoking (Tr. at 46). Plaintiff said he could afford cigarettes because his mother gave him money (Tr. at 47). Plaintiff went to the free clinic in 2010 and the doctor sent him to have a stress test (Tr. at 47). That is when they discovered his first bad heart valve (Tr. at 47).

Everything is pretty healthy with his heart except the bleeders (Tr. at 61). Plaintiff does get burning and numbness in his left arm (Tr. at 61). Plaintiff had chest pains and lightheadedness and dizzy spells, and at the time of the hearing he was wearing a heart monitor that would record what is going on in his heart when that happens (Tr. at 61). The monitor is always monitoring but it only records when he activates it (Tr. at 64). Plaintiff has only been to Dr. Krishna's office twice (Tr. at 61-62). He is the one who ordered the tests and gave plaintiff the heart monitor (Tr. at 62). One time plaintiff activated it four times in one day (Tr. at 65). Since he has had the monitor (he got it about a week earlier), he had activated it eight or nine times (Tr. at 65). Plaintiff had heart pain as far back as three years ago but did not see a doctor

about that (Tr. at 65).  He has never been to the emergency room for his heart, has not

had a heart attack, and has not had surgery on his heart (Tr. at 66).  Plaintiff might have

dizzy spells four times in one day, but he may go two or three days without one (Tr. at

66).  Plaintiff is not taking any medication for his heart, not even baby aspirin (Tr. at 68).

Plaintiff has back pain every day (Tr. at 67).  If he lies on the floor, flat on his

back, and props a chair under his legs, his pain improves (Tr. at 67).  Walking bothers

his back the most (Tr. at 68).  Plaintiff goes to the grocery store, but if his back is

hurting he will stay in the truck; and because sitting hurts his back, he will get out of the

truck and stand and hang onto the door (Tr. at 68).  Plaintiff said he was taking Valium

for his back pain (Tr. at 68).

Plaintiff does not take any medication for his hypertension (Tr. at 68).  He used

to take medication, but he is off of it now because his blood pressure is staying low (Tr.

at 69).

Plaintiff has difficulty sleeping because he can't get comfortable (Tr. at 77).  He

wakes up at least three times every night (Tr. at 77).  Plaintiff has difficulty with gripping

-- even if he tries to pick up a stick of wood, he has a hard time gripping and picking it

up (Tr. at 77).  Last summer he built some boxes for his chickens and used a hammer

for about two hours (Tr. at 77).  For the next three days, he had trouble even gripping a

glass of tea (Tr. at 77).  When his shoulders start hurting, it is difficult for him to pull up

his pants (Tr. at 77).

Plaintiff was asked to describe what he did on a typical day a few days before

the hearing (Tr. at 49).  He said he sat around probably half the day (Tr. at 49).  He fed

his chickens and his dogs (Tr. at 49). The chicken pen is about 40 yards from the house (Tr. at 49). Plaintiff has approximately 40 chickens, and he carries their food in a bucket that weighs about 10 pounds (Tr. at 50-51). He feeds them twice a day (Tr. at 51). Plaintiff buys dog food in 50-pound bags (Tr. at 49). He carries a bag of food about 10 feet from his truck to the house and then up two steps (Tr. at 50, 59). Sometimes his wife "snatches it" from him, and sometimes his daughter will carry it in (Tr. at 59). He carried wood into the house (Tr. at 49). He usually cuts the wood himself (Tr. at 52). He last cut a tree down shortly before the hearing (Tr. at 52). He last split wood a few months before the hearing (Tr. at 53). He has a hydraulic splitter, but it has not worked in two years (Tr. at 53). Plaintiff does all of his own mechanic work (Tr. at 53). He used to work on cars, but he does not do that anymore because it is getting harder to turn wrenches because of his hands and wrists, and bending over to work on a car hurts his lower back too much (Tr. at 53-54). Plaintiff last did a brake job on his mother's truck about three months before the hearing (Tr. at 54).

Plaintiff and his wife do the cooking together (Tr. at 57). For example, he may peel the potatoes while his wife gets other food out, then she goes to sit down while he gets the meat cooking (Tr. at 57). Plaintiff does dishes sometimes, and sometimes his wife tells him to get out of the kitchen because he is getting in her way (Tr. at 57).

Plaintiff shifts around a lot when he is sitting (Tr. at 58). If he is not comfortable sitting, he stands up and puts most of his weight on his right leg because his left hip gives him problems (Tr. at 58-59).

2.     **Vocational expert testimony.**

Vocational expert Denise Weaver testified at the request of the Administrative Law Judge.  The first hypothetical involved a person who is limited to light work, who could frequently climb ramps and stairs but could only occasionally climb ladders or scaffolds.  The person could frequently balance, stoop, kneel, crouch and crawl.  The person could only occasionally be exposed to hazards such as unprotected heights, but could frequently be exposed to hazards such as moving mechanical parts (Tr. at 80). The vocational expert testified that such a person could not perform plaintiff's past relevant work (Tr. at 80).  Such a person could work as a fast food worker, DOT 311.472-010, light with an SVP of 2.  There are 1,500,000 positions in the country and 9,300 in Missouri (Tr. at 81).  The person could work as a garment sorter, DOT 222.687-014, light with an SVP of 2.  There are 27,500 in the country and 715 in Missouri (Tr. at 81).  The person could work as a cashier II, DOT 211.462-010, light with an SVP of 2.  There are 950,000 in the country and 10,000 in Missouri (Tr. at 81).

The second hypothetical involved a person limited to sedentary work.  He could not climb anything; he could frequently balance or stoop; he could never kneel, crouch or crawl.  He could have no exposure to hazards such as unprotected heights and moving mechanical parts.  He could have only occasional exposure to extreme cold, vibration, dusts and fumes (Tr. at 81-82).  The vocational expert testified that the person could not perform plaintiff's past relevant work, but the person could work as a document preparer, microfilming, DOT 249.587-018, sedentary with an SVP of 2. There are 30,000 in the country and 595 in Missouri (Tr. at 82).  The person could work

12

as a dowel inspector in the woodworking industry, DOT 669.687-014, sedentary with an SVP of 2. There are 16,500 in the country and 430 in Missouri (Tr. at 82). The person could be a patcher in the household appliances industry, DOT 723.687-010, sedentary with an SVP of 2. There are 41,625 in the country and 1,025 in Missouri (Tr. at 82).

The next hypothetical was the same a the second except the person would be limited to occasional reaching and fingering (Tr. at 82). Such a person could not work, because sedentary positions typically require good bilateral use of the hands (Tr. at 82).

If a person needed to take more breaks than typical and would be off task 20 percent of the workday, he could not work (Tr. at 83).

C. **SUMMARY OF MEDICAL RECORDS**

On November 3, 2009, plaintiff was seen at Medical Missions for Christ, a free clinic, complaining of dizziness and blurred vision (Tr. at 321). The doctor ordered a stress test[1] and an echocardiogram[2] and told plaintiff to use over-the-counter Prilosec

---

[1]"A stress test, also called an exercise stress test, gathers information about how your heart works during physical activity. Because exercise makes your heart pump harder and faster than usual, an exercise stress test can reveal problems within your heart that might not be noticeable otherwise. An exercise stress test usually involves walking on a treadmill or riding a stationary bike while your heart rhythm, blood pressure and breathing are monitored."
http://www.mayoclinic.org/tests-procedures/stress-test/basics/definition/prc-20019801

[2]"An echocardiogram uses sound waves to produce images of your heart. This commonly used test allows your doctor to see your heart beating and pumping blood. Your doctor can use the images from an echocardiogram to identify heart disease."
http://www.mayoclinic.org/tests-procedures/echocardiogram/basics/definition/prc-20013918

13

(decreases stomach acid). He was assessed with systolic murmur[3] and tobacco abuse.

On December 8, 2009, plaintiff was seen at the free clinic for indigestion, bloating and chest pain (Tr. at 320). His blood pressure was 136/70. His exam was normal. Plaintiff was assessed with gastroesophageal reflux disease ("GERD") and was prescribed medication.

That same day plaintiff had an exercise stress test at Lake Regional Hospital due to a history of chest pain (Tr. at 333). His resting blood pressure was 161/88. The test was normal except plaintiff had a hypertensive response to exercise -- his blood pressure went up to 200/70, although he recovered quickly in the recovery phase with no ischemic changes[4] and no chest pain (Tr. at 334). He had a normal left ventricular ejection fraction of 61%[5] (Tr. at 339-

---

[3]"Heart murmurs are sounds during your heartbeat cycle -- such as whooshing or swishing -- made by turbulent blood in or near your heart. These sounds can be heard with a stethoscope. A normal heartbeat makes two sounds like 'lubb-dupp' (sometimes described as 'lub-DUP'), which are the sounds of your heart valves closing. Heart murmurs can be present at birth (congenital) or develop later in life. A heart murmur isn't a disease -- but murmurs may indicate an underlying heart problem. Often, heart murmurs are harmless (innocent) and don't need treatment. Some heart murmurs may require follow-up tests to be sure the murmur isn't caused by a serious underlying heart condition. Treatment, if needed, is directed at the cause of your heart murmur." http://www.mayoclinic.org/diseases-conditions/heart-murmurs/basics/definition/con-200 28706

[4]Restriction in blood supply to tissues.

[5]"Ejection fraction is a measurement of the percentage of blood leaving your heart each time it contracts. During each heartbeat pumping cycle, the heart contracts and relaxes. When your heart contracts, it ejects blood from the two pumping chambers (ventricles). When your heart relaxes, the ventricles refill with blood. No matter how forceful the contraction, it never is able to pump all of the blood out of a ventricle. The term 'ejection fraction' refers to the percentage of blood that's pumped out of a filled ventricle with each heartbeat. The left ventricle is the heart's main pumping chamber

14

341).  He also had a transthoracic echocardiogram[6] which was normal except for mild to moderate aortic valve regurgitation[7] (Tr. at 336).  A carotid evaluation showed a 1-15% stenosis (narrowing) of the bilateral internal carotid arteries[8] and



Basilar
Right internal carotid
Right external carotid
Vertebral
Right common carotid
Right subclavian
Right internal mammary
Brachiocephalic (innominate)

Left internal carotid
Left external carotid
Left common carotid
Left subclavian
Left internal mammary
Aortic arch

---

that pumps oxygenated blood through the ascending (upward) aorta to the rest of the body, so ejection fraction is usually measured only in the left ventricle (LV).  An LV ejection fraction of 55 percent or higher is considered normal."
http://www.mayoclinic.org/ejection-fraction/expert-answers/faq-20058286

[6]"During a transthoracic echocardiogram (TTE), a technician obtains views of the heart by moving a small instrument called a transducer to different locations on the chest or abdominal wall.  A transducer, which resembles a microphone, sends sound waves into the chest and picks up echos that reflect off different parts of the heart."
http://my.clevelandclinic.org/services/heart/diagnostics-testing/ultrasound-tests/transthoracic-echocardiogram-tte

[7]"Aortic valve regurgitation -- or aortic regurgitation -- is a condition that occurs when your heart's aortic valve doesn't close tightly.  Aortic valve regurgitation allows some of the blood that was just pumped out of your heart's main pumping chamber (left ventricle) to leak back into it.  The leakage may prevent your heart from efficiently pumping blood to the rest of your body.  As a result, you may feel fatigued and short of breath."
http://www.mayoclinic.org/diseases-conditions/aortic-valve-regurgitation/basics/definition/con-20022523

[8]"Arteries carry oxygen-rich blood away from the heart to the head and body.  There are two carotid arteries (one on each side of the neck) that supply blood to the brain. The carotid arteries can be felt on each side of the lower neck, immediately below the angle of the jaw.  The carotid arteries supply blood to the large, front part of the brain, where thinking, speech, personality and sensory and motor functions reside.  The vertebral arteries run through the spine and supply blood to the back part of the brain (the brainstem and cerebellum).  Carotid artery disease, also called carotid artery

15

antegrade flow within both vertebral arteries (one of two key arteries located in the back of the neck that carry blood from the heart to the brain, spine, and neck muscles -- see diagram on page 15. Antegrade flow means the flow is going in the normal direction.) (Tr. at 337-338).

On December 30, 2009, plaintiff had lab work done (Tr. at 318-319). The doctor noted that plaintiff might benefit from a low dose of thyroid medication and prescribed Levothyroxine.

On January 5, 2010, plaintiff was seen at the free clinic, reporting that he was "still dizzy at times" and was still having chest pains (Tr. at 317). He was taking Atenolol for hypertension. His exam was normal. He was assessed with moderate aortic valve stenosis.[9] The doctor gave him a



_____

stenosis, is the narrowing of the carotid arteries, usually caused by atherosclerosis. Atherosclerosis is the buildup of cholesterol, fat and other substances traveling through the bloodstream, such as inflammatory cells, cellular waste products, proteins and calcium. These substances stick to the blood vessel walls over time as people age, and combine to form a material called plaque. Plaque buildup can lead to narrowing or blockage in the carotid artery which, when significant, can put an individual at increased risk for stroke." http://my.clevelandclinic.org/services/heart/disorders/carotid-artery

[9]"Aortic valve stenosis -- or aortic stenosis -- occurs when the heart's aortic valve narrows. This narrowing prevents the valve from opening fully, which obstructs blood flow from your heart into your aorta and onward to the rest of your body. When the aortic valve is obstructed, your heart needs to work harder to pump blood to your body. Eventually, this extra work limits the amount of blood it can pump and may weaken your heart muscle."

16

prescription for Lisinopril for hypertension.

On February 16, 2010, plaintiff was seen at the free clinic for medication refills (Tr. at 316). Plaintiff was smoking two packs of cigarettes per day. His blood pressure was 148/72. He reported having some chest pain every day. He was assessed with dizzy spells and hypertension. The doctor gave plaintiff prescriptions for Lisinopril and Atenolol for hypertension and told him to see a cardiologist.

There are no medical records for the next year.

On February 15, 2011, plaintiff was seen at the free clinic, because he had been out of his blood pressure medications for three months (Tr. at 314-315). His blood pressure was 140/82. He reported shortness of breath. His physical exam was normal except wheezing could be heard bilaterally. Blood work was ordered, and plaintiff was given prescriptions for Lisinopril and Atenolol.

There are no medical records for the next eight months.

On October 13, 2011, plaintiff had a pulmonary function test (Tr. at 327-332). Plaintiff continued to smoke two packs of cigarettes per day and had for 35 years. He reported shortness of breath after any exertion. The only medications listed were for sinus allergies and headaches.

There are no medical records for the next two years.

On October 28, 2013, plaintiff saw Robert Mason, D.O., to establish care (Tr. at 350-353). Plaintiff reported left hip pain for the past 30 years, bilateral wrist and hand

---

http://www.mayoclinic.org/diseases-conditions/aortic-stenosis/basics/definition/con-200
26329

17

pain with "no grip" for the past year, COPD, heart

valve problems, and dizzy spells for the past three

years. His blood pressure was 156/77. He was

still smoking. On exam Dr. Mason heart a strong

grade 4 systolic murmur[10] and respiratory wheezes

in all lung fields. Straight leg raising was negative.



Plaintiff had tenderness around the left sacroiliac joint in the lumbar spine. He had

restriction of motion in the lumbar area, but no measurements were provided. Blood

work was done. Plaintiff was assessed with dizziness, valvular heart disease,

hypertension, degenerative joint disease, and COPD. Dr. Mason ordered carotid x-rays

and ultrasound, and x-rays of the lumbar spine, left hip,

and chest.

    On October 31, 2013, plaintiff had a carotid

evaluation ultrasound performed by John Dymond,

M.D. (Tr. at 356). Dr. Dymond noted 1 to 15%

occlusive disease of the bilateral internal carotid artery

(see footnote 8 on page 15) -- "a slight amount of

intimal plaque." Chest x-rays showed no acute

---

[10]"A murmur that occurs when the heart muscle relaxes between beats is called a
diastolic murmur. A systolic murmur is one that occurs when the heart muscle
contracts. Systolic murmurs are graded by intensity (loudness) from one to six. A
grade 1/6 is very faint, heard only with a special effort. A grade 6/6 is extremely loud.
It's heard with a stethoscope slightly removed from the chest."
http://www.heart.org/HEARTORG/Conditions/More/CardiovascularConditionsofChildhoo
d/Heart-Murmurs_UCM_314208_Article.jsp#.V9tsp_krLIU

cardiopulmonary disease (Tr. at 357). X-rays of the left hip showed only mild degenerative changes (Tr. at 358). X-rays of the sacroiliac joints were normal (Tr. at 359). X-rays of the lumbar spine showed only mild degenerative changes (Tr. at 360).

On November 11, 2013, plaintiff saw Robert Mason, D.O. (Tr. at 348-349). "Patient continues to have disabling pain in the low back area radiating into the left leg, also notes persistent dizziness with blurred vision, he has seen an eye doctor and other physicians regarding this." Plaintiff's blood pressure was 144/79. He continued to smoke. The physical exam appears to have been very limited: "On physical exam the patient is pleasant, he is cooperative, he walks in a somewhat guarded manner, skin warm dry, and no dependent edema, good eye contact." Dr. Mason assessed back pain with radiation, degenerative joint disease of the lumbar spine, dizziness, and valvular heart disease. He prescribed Mobic (non-steroidal anti-inflammatory) for back pain, Antivert (an antihistamine that treats dizziness associated with motion sickness, also called Dramamine), and Valium (a sedative). An MRI of the lumbar spine was scheduled for November 14, 2013.

On November 14, 2013, plaintiff saw Muthu Krishnan, M.D., to reestablish cardiac care (Tr. at 367-368). Plaintiff complained of shortness of breath on exertion, and occasional dizziness. "He has left arm discomfort, left shoulder discomfort." On exam an ejection systolic murmur (see footnote 3, page 14) was heard. Lungs were clear with no wheezing, rhonchi or rales.[11] Plaintiff continued to smoke. Dr. Krishnan

---

[11]Wheezes are high-pitched and shrill sounding breath sounds that occur when the airway becomes narrowed. They often have a musical quality to them. Rhonchi are often a low-pitched moan that is more prominent on exhalation. It differs from wheezes

assessed aortic stenosis, shortness of breath, chronic airway obstruction, chest pain, and tobacco abuse and ordered an EKG.[12]

On November 15, 2013, an MRI of the lumbar spine was done showing no evidence of disc herniation or lumbar spinal stenosis (narrowing) (Tr. at 354). He had multilevel degenerative disc disease greatest at L5-S1, and some mild foraminal stenosis[13] at L4-5 and L5-S1.



in that wheezes are high and squeaky while these are low and dull. Rhonchi are caused by blockages to the main airways by mucous, lesions, or foreign bodies. Rales (also called crackles) are the sounds you will hear in a lung field that has fluid in the small airways.
http://www.ausmed.com.au/blog/entry/rhonchi-rales-lung-sounds-made-easy

[12]"An electrocardiogram is used to monitor your heart. Each beat of your heart is triggered by an electrical impulse normally generated from special cells in the upper right chamber of your heart. An electrocardiogram -- also called an ECG or EKG -- records these electrical signals as they travel through your heart. Your doctor can use an electrocardiogram to look for patterns among these heartbeats and rhythms to diagnose various heart conditions."
http://www.mayoclinic.org/tests-procedures/electrocardiogram/basics/definition/prc-200 14152

[13]"Each of the 33 bones of the spine has a large central opening for the spinal cord. Additional openings called foramen allow the nerves branching from the spinal cord to travel to the arms, legs and other parts of the body. Normally nerve roots have enough room to easily slip through the foramen. However, with age and conditions like arthritis,

On November 20, 2013, plaintiff had a stress test with no cardiac symptoms during the test (Tr. at 396-397). Ejection fraction was normal at 63%. No ischemia (inadequate blood supply to an organ) was present. He had no exercise induced chest pain. The electrocardiographic portion of the stress test was negative for cardiac ischemia (inadequate blood supply to the heart).

On December 3, 2013, plaintiff saw Muthu Krishnan, M.D., for a follow up (Tr. at 364-365, 394-395). Plaintiff was told that his stress test was normal. His echocardiogram revealed moderate mitral regurgitation[14] (see diagram on page 16), aortic stenosis (see footnote 9 on page 16) and moderate aortic regurgitation (see footnote 7 on page 15). On exam plaintiff had an ejection systolic murmur (see footnote 3 on page 14). His chest was clear with no wheezing. He had no muscle or joint pains, no stiffness, no swelling, no limitation of movement. He continued to smoke. He was assessed with dizziness, valvular heart disease, hypertension, COPD with chronic bronchitis, and aortic stenosis. He was prescribed an event monitor.

---

the foramen may become clogged. Bony spurs can develop inside and press on the nerves. When the passage through which the spinal cord runs becomes clogged, the condition is called spinal stenosis."
https://www.cedars-sinai.edu/Patients/Health-Conditions/Foraminal-Stenosis.aspx

[14]"Mitral valve regurgitation -- also called mitral regurgitation, mitral insufficiency or mitral incompetence -- is a condition in which your heart's mitral valve doesn't close tightly, allowing blood to flow backward in your heart. As a result, blood can't move through your heart or to the rest of your body as efficiently, making you feel tired or out of breath."
http://www.mayoclinic.org/diseases-conditions/mitral-valve-regurgitation/home/ovc-2012 1849

On December 11, 2013, plaintiff saw Muthu Krishnan, M.D., to get a cardiac event monitor due to complaints of dizziness (Tr. at 363).

On January 9, 2014, plaintiff saw Muthu Krishnan, M.D. (Tr. at 361-362). "Patient complains of dizziness. All cardiac workup has been negative so far." In the review of systems, plaintiff denied headaches, weakness, shortness of breath, shortness of breath on exertion, trouble breathing, chest pain, and change in exercise tolerance. He reported normal range of motion in his musculoskeletal system, normal stability, strength and tone. Plaintiff continued to smoke. He was taking Lasix (diuretic), Albuterol and Nebulization treatment for COPD, Mobic (non-steroidal anti-inflammatory), and Valium (sedative). On exam, plaintiff's heart sounds were normal. He had no tenderness on his chest wall and his lungs were clear to auscultation and percussion.[15] He had normal motor strength bilaterally, no muscle or joint pains, no stiffness, no swelling, and no limitation of movement. Dr. Krishnan reviewed plaintiff's EKG (see footnote 12 on page 20), echo (see footnote 2 on page 13), and lab tests. He assessed aortic stenosis (see footnote 9 on page 16), shortness of breath, chest pain, and dizziness. He prescribed a diagnostic imaging event monitor for 30 days and told plaintiff to follow up in six months.

On January 13, 2014, plaintiff saw Robert Mason, D.O., for a follow up (Tr. at 400-401). Plaintiff said he needed something stronger for pain. His dizziness and

---

[15]Auscultation is the act of placing the stethoscope on the patient's back and listening for breath sounds. Percussion is tapping on the back. When you tap a hollow surface there is a different sound than if you tap a solid object. A lung filled with air will sound hollow if you tap on the back. A lung filled with fluid or infection will sound dull.

unsteadiness was coming from pressure behind his eyes.  He continued to smoke.  An MRI of the brain was ordered.  Dr. Mason prescribed Tramadol for pain.

On January 23, 2014, plaintiff had an MRI of the brain which was normal (Tr. at 403).

On January 27, 2014, plaintiff saw Robert Mason, D.O., for a follow up (Tr. at 398-399).  "Doing about the same/still having dizzy spells with headaches.  Plaintiff said a fullness and tightness in the sinus area seemed to be causing difficulty with his balance.  He continued to smoke.  His brain CAT scan was essentially normal.  An examination was limited to plaintiff's ears and nose.  Dr. Mason referred plaintiff to an orthopedic surgeon for his back and to an otolaryngologist (also called an ear, nose and throat doctor) for his dizziness.

## V.    FINDINGS OF THE ALJ

Administrative Law Judge Robert Spaulding entered his opinion on February 10, 2014 (Tr. at 11-18).  Plaintiff's last insured date was March 31, 2012 (Tr. at 13).

Step one.  Plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 13).

Step two.  Plaintiff has the following severe impairments:  aortic stenosis, valvular heart disease, lumbar degenerative disc disease, mild left hip degenerative joint disease, and hypertension (Tr. at 13).  Plaintiff's chronic obstructive pulmonary disease is nonsevere because it has not had a significantly limiting effect on plaintiff's ability to perform basic work activities (Tr. at 13).  Plaintiff's alleged dizziness is not a medically determinable impairment because there are no objective signs or findings of

23

any medically determinable impairment causing that alleged symptom (Tr. at 14).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 14).

Step four. Plaintiff retains the residual functional capacity to perform light work except that he can frequently climb ramps and stairs but only occasionally climb ladders, ropes and scaffolds; frequently balance, stoop, kneel, crouch, or crawl; is limited to occasional exposure to hazards such as unprotected heights; and can have frequent exposure to hazards such as moving mechanical parts (Tr. at 14). With this residual functional capacity, plaintiff is unable to perform his past relevant work as a laborer (Tr. at 16).

Step five. Plaintiff is capable of working as a fast food worker, garment sorter, or cashier, all available in significant numbers in the national economy (Tr. at 17-18). Therefore, plaintiff is not disabled (Tr. at 18).

## VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ improperly assessed plaintiff's credibility because the ALJ should not have considered activities of daily living or plaintiff's failure to seek medical treatment: "claimaint 'may be unable to afford treatment and may not have access to free or low-cost medical services.'" (plaintiff's brief p. 42).

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints.

24

Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

25

Although an ALJ may not discount allegations of disabling pain solely on the lack of objective medical evidence, see 20 C.F.R. §§ 404.1529(c)(2) and 416.020 (c)(2), the lack of objective medical evidence is properly considered in the credibility assessment. Forte v. Barnhart, 377 F.3d 892, 895 (8th Cir. 2004). In assessing plaintiff's credibility, the ALJ found that plaintiff's course of treatment was not consistent with disabling symptoms. Although plaintiff claimed disability as of September 2009, he had only minimal medical treatment, with no medical treatment at all between February 2010 and February 2011, when he returned to the free clinic for refills, noting he had been out of medication for over three months. More than two and a half years passed before he next sought treatment. Despite his complaints of disabling heart impairments, plaintiff first met with a cardiologist in November 2013, more than four years after his alleged onset of disability. Had plaintiff been experiencing disabling pain, dizziness, and other symptoms as alleged, one would reasonably expect that he would have would have sought more frequent or aggressive treatment. See Edwards v. Barnhart, 314 F.3d 964, 967 (8th Cir. 2003) ("[T]he ALJ concluded, and we agree, that if her pain was as severe as she alleges, [plaintiff] would have sought regular medical treatment.").

Moreover, the treatment plaintiff did receive was conservative. There is no evidence that he required emergency treatment, surgical intervention, pain management, inpatient care, any ambulatory device, or frequent changes in medications or doses. In October 2011, plaintiff reported his only medications were over-the-counter headache medications and for allergies. At the time of the hearing, plaintiff was taking no medication for his heart condition or hypertension. A pattern of

26

conservative medical treatment is a proper factor for an ALJ to consider in evaluating a claimant's credibility. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001).

Plaintiff argues that an ALJ may not draw inferences from a claimant's failure to pursue regular medical treatment without first considering any explanations the claimant provides (plaintiff's brief p. 41-42). Plaintiff explains that he had good cause for his lack of treatment -- he could not afford it -- and once he received Medicaid, he began seeking treatment more vigorously (plaintiff's brief, p. 44). An ALJ may assess a claimant's real motivation for failing to follow prescribed treatment or seek medical attention, and the fact that plaintiff is under financial strain is not determinative. Whitman v. Colvin, 762 F.3d 701, 706 (8th Cir. 2014). In this case, plaintiff went to a free clinic as far back as 2009, shortly after his alleged onset date. He visited that clinic infrequently and was last seen there in 2011, with his last couple of appointments being only for medication refills. He offers no explanation for his failure to seek more frequent treatment at that free clinic.

Nothing in the record indicates that plaintiff was ever denied treatment due to lack of financial resources. In addition, as the ALJ noted, plaintiff was able to afford two packages of cigarettes a day, despite his claimed inability to afford medical treatment, which detracts from his credibility. See Riggins v. Apfel, 177 F.3d 689 (8th Cir. 1999) ("Although Riggins claims he could not afford such medication, there is no evidence to suggest that he sought any treatment offered to indigents or chose to forgo smoking

27

three packs of cigarettes a day to help finance pain medication").[16]

Plaintiff argues that the ALJ erred in considering his continued smoking in the credibility assessment. Plaintiff argues that he is attempting to quit and there is nothing in the record to show that his condition would improve if he quit smoking (plaintiff's brief p. 35). However, the ALJ did not state that plaintiff's condition would improve if he quit smoking. Rather, the ALJ stated that plaintiff's alleged inability to afford medications and health care is less credible, given that he continues to engage in the expensive habit of smoking two packages of cigarettes a day.

In finding that plaintiff's allegations were not wholly credible, the ALJ observed that plaintiff's daily activities were highly inconsistent with his allegations of disabling impairments. When plaintiff applied for benefits, three years after he stopped working, he indicated that he spent the day caring for animals, driving his mother around, doing yard work, and watching television. He watched his grandchildren (which included "all aspects of care"), prepared full meals, drove, shopped, hunted, and fished, and had no difficulties with personal care. At the administrative hearing, plaintiff testified that his daily activities included feeding chickens and dogs twice daily, carrying 50-pound bags of dog food, cutting and carrying firewood, doing automobile mechanic work, and tending 15 acres of land. Plaintiff was able to drive himself nearly 90 miles to the hearing, and he reported in his administrative paperwork that he drives his mother "and

_____

[16]In the medical records plaintiff submitted (document number 26), plaintiff's continued smoking is established -- on June 16, 2015, plaintiff saw Jeffrey Jorgenson, M.D., and reported continuing to smoke a pack of cigarettes each day (p. 3, 5). This was almost a year and a half after the ALJ's opinion.

others" to their appointments.  Inconsistencies between plaintiff's subjective complaints and his activities diminish his credibility.  <u>Goff v. Barnhart</u>, 421 F.3d 785, 792 (8th Cir. 2005).

Plaintiff states that the mere fact that a claimant engages in certain daily activities does not in any way detract from his credibility as to disability (plaintiff's brief, p. 35).  Plaintiff contends that an ability to engage in personal activities such as hobbies does not constitute substantial evidence that an individual has the residual functional capacity to engage in work activity (plaintiff's brief, p. 34, 41).  The ALJ did not state that the ability to engage in personal activities and hobbies is substantial evidencing establishing the ability to work.  Rather, he stated that plaintiff's activities are inconsistent with his allegations of disabling pain and dizziness and as such, undermine his credibility.  Had plaintiff experienced pain, dizziness, and other symptoms to the extent alleged, it is highly unlikely that he would be able to cut down a tree, chop wood, carry 50-pound bags of dog food, change brakes on a car, and drive long distances. The ALJ properly found that plaintiff's daily activities call into question the credibility of his allegations of disabling symptoms.

Plaintiff also argues that the ALJ erred relying on plaintiff's daily activities to support a finding that he is not disabled, because the ALJ failed to inquire into the specifics of those activities or determine whether plaintiff had difficulties in performing them (plaintiff's brief, p. 33-34, 40).  Although plaintiff may have had some limitations or experienced some pain doing these activities, this does not establish disability.  <u>Perkins v. Astrue</u>, 648 F.3d 892, 903 (8th Cir. 2011) (quoting <u>Jones v. Chater</u>, 86 F.3d 823, 826

(8th Cir. 1996)) ("While pain may be disabling if it precludes a claimant from engaging in any form of substantial gainful activity, the mere fact that working may cause pain or discomfort does not mandate a finding of disability."); Browning v. Sullivan, 958 F.2d 817, 823 (8th Cir. 1992) (work performed on a part-time basis or with considerable difficulty in spite of limitations still demonstrates an ability to perform substantial gainful activity).  Therefore, plaintiff's ability to engage in the daily activities as he described, even if difficult or painful to do so, indicates that plaintiff's impairments are not as limiting as he claims.

Plaintiff's allegations of disability are further undermined by the fact that he left his previous jobs as a maintenance person and as landscaper because he was laid off, not because of any medical condition.  Plaintiff started his own landscaping business the same year as his alleged onset date.  He testified that the bad economy caused him to let his employees go that year and, although he alleges he became totally disabled in 2009, he testified that he continued operating his landscaping business for a couple more years but on a small scale.  The fact that plaintiff quit working because he was laid off or due to economic conditions weighs against his credibility. Milam v. Colvin, 794 F.3d 978, 983 (8th Cir. 2015).

The ALJ made express credibility determinations and set forth the inconsistencies which led to his conclusions.  Because the ALJ explicitly discredited plaintiff's testimony, gave legally sufficient reasons for doing so, and it was supported by substantial evidence in the record as a whole, his judgment on this issue will be affirmed.

## VII. CONTROLLING WEIGHT TO TREATING/EXAMINING DOCTORS

Plaintiff argues that the ALJ erred in failing to give controlling weight (or great weight) to the opinions of his treating or examining physicians. However, plaintiff fails to identify what opinion, what doctor, or what functional restriction is the subject of his argument.

A "medical opinion" is a statement from a physician or acceptable medical source that reflects the doctor's judgments about the nature and severity of an individual's impairments, including an individual's diagnosis, prognosis, and what the individual is able to do despite any physical or mental restrictions. 20 C.F.R. §§ 404.1527(a) and 416.927(a); SSR 95-5p and 96-2p. To be entitled to controlling weight, opinions must come from a treating source and must be well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence of record. SSR 96-2p. Treatment records and test results, in and of themselves, are not medical opinions. The medical records cited by plaintiff do not contain a doctor's judgment about plaintiff's functional limitations.

In making a residual functional capacity assessment, the ALJ specifically noted that there were no treating or examining source opinions in the record. Plaintiff argues that the ALJ incorrectly stated that there were no treating or examining source opinions in the record, given that the record contains findings of faulty heart valves in April 2015 and a diagnosis of throat cancer in September 2015 (plaintiff's brief p. 26). However, these records were not before the ALJ when he made his decision (they were filed by plaintiff after the administrative record was filed in this case), and are not germane to a

31

determination of whether plaintiff was disabled from September 1, 2009 (his alleged

onset date) through February 10, 2014 (the date of the ALJ's opinion). The medical

records cited by plaintiff are dated well over a year after the ALJ rendered his opinion.

An application for disability benefits is effective through the date of the ALJ's decision.

20 C.F.R. §§ 404.620 and 416.330. When a claimant's condition deteriorates after the

date of the ALJ's opinion, his remedy is to file a new application for benefits. See Riley

v. Shalala, 18 F.3d 619, 623 (8th Cir. 1994).

### VIII. SMOKING

Plaintiff argues that the ALJ erred in considering plaintiff's smoking since there is

nothing in the records showing that a doctor said plaintiff's condition would improve if he

quit smoking. Contrary to plaintiff's argument, the ALJ did not find that plaintiff's

condition would improve if he quit smoking. The ALJ noted that plaintiff's allegation of

not seeking medical treatment very often due to lack of finances was not credible in

light of his smoking two packs of cigarettes per day. Plaintiff testified that his mother

provided funds for him to buy cigarettes; however, the ALJ noted that plaintiff could

have used those funds for medical care if his symptoms were truly as bad as he

claimed.

### IX. RESIDUAL FUNCTIONAL CAPACITY

Plaintiff argues that the ALJ erred in assessing plaintiff's residual functional

capacity because the ALJ failed to consider plaintiff's amputated right thumb, two bad

heart valves "that will require a valve repair in the near future," and the heart monitor

plaintiff has to wear. Plaintiff argues that the ALJ did not make any findings with regard

to plaintiff's ability to use his hands without a thumb, and that the lack of a thumb limits his ability to reach and feel. He argues that the defective heart valves require him to take extra breaks during the day.

Plaintiff's thumb was amputated in 1988 -- twenty-one years before his alleged onset date. The record reflects that he was able to perform substantial gainful activity despite lacking one of his thumbs. Plaintiff did not allege disability based on his amputated thumb; and despite his argument that his reaching is impaired due to this condition, in his administrative paperwork he indicated that his impairments do not affect his ability to reach. Plaintiff's daily activities since his alleged onset date establish that he has been able to feed animals, bathe animals, do yard work, drive, do dishes, vacuum, do laundry, care for his grandchildren, prepare meals including "many courses/dishes," mow, use a weed eater, do household chores, sweep, shop, hunt, fish, work on vehicles including performing all mechanic work and replacing brakes, build boxes for chickens, use a hammer, cut wood, and split wood. Prior to his alleged onset date but after his thumb was amputated, plaintiff was able to perform ground maintenance, swimming pool maintenance, and minor maintenance work at a condominium complex; run a landscape business; and work as a laborer. He testified that any difficulty he has with gripping wrenches and hammers was due to his "hands and wrists," not because he is missing a thumb. Additionally, the only medical record wherein plaintiff complained of difficulty gripping was October 28, 2013 (more than four years after his alleged onset date) when plaintiff said he had had "no grip" for the last year. Dr. Mason's record does not reflect any problem with plaintiff's grip.

33

With respect to his heart valve problem, plaintiff cites to a medical record dated June 16, 2015 (sixteen months after the ALJ's opinion) which states that he will need heart valve repair in the near future; however, that part of the record was from plaintiff's own report of his medical history, not an opinion of a doctor. Plaintiff cites to no medical record indicating that his heart valve issue (as opposed to his continued smoking) is the cause of his alleged need to take extra breaks during the day. On January 9, 2014, the month before the ALJ's opinion, plaintiff's treating cardiologist wrote, "All cardiac workup has been negative so far." During that appointment, plaintiff denied weakness, shortness of breath, shortness of breath on exertion, trouble breathing, chest pain, or any change in exercise tolerance. Plaintiff's alleged need to take extra breaks during the day because of his heart valves is not supported by the evidence.

Although plaintiff argues that the ALJ failed to consider plaintiff's heart monitor in assessing a residual functional capacity, plaintiff fails to identify any functional ability that would be affected by wearing a monitor, and the record fails to reflect any such limitation.

## X.    *HYPOTHETICAL QUESTION*

Plaintiff argues that the ALJ erred in failing to include plaintiff's dizziness and chronic pain in the hypothetical question posed to the vocational expert.

A hypothetical question is sufficient if it sets forth the functional limitations supported by substantial evidence in the record. Goff v. Barnhart, 421 F.3d at 794. Dizziness and pain are not impairments; rather, they are symptoms. See 20 C.F.R. §§

34

404.1508 and 416.908 ("impairment[s] must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms"); 20 C.F.R. §§404.15279(b) and 416.029(b) (symptoms will not be found to affect functional ability unless medical signs or laboratory findings show that a medically determinable impairment is present).

When formulating a hypothetical question to a vocational expert, an ALJ need not include restrictions he finds not credible. <u>Milam v. Colvin</u>, 794 F.3d 978,985 (8th Cir. 2015). Although the record reflects that plaintiff complained of dizziness, he continued to drive and none of his doctors ever recommended he refrain from driving or any other activity due to his dizziness. Plaintiff's "chronic pain" was treated with nothing more than non-steroidal anti-inflammatories, except for one occasion when he was prescribed Tramadol. The record of plaintiff's pain treatment does not support a finding of any functional restrictions greater than those found by the ALJ.

## XI. CONCLUSIONS

Plaintiff makes additional arguments in his brief which are unsupported. For example, plaintiff argues that the ALJ erroneously gave more weight to a non-examining physician than to an examining physician; however, he fails to identify what doctor's opinion should have been given more weight. Plaintiff argues that the ALJ erred by failing to explain why plaintiff's impairments did not medically equal a listing. Plaintiff fails to identify the impairment or combination of impairments he believes meets a listing, and I note that the ALJ specifically addressed and dismissed Listings

Case 2:15-cv-04170-REL   Document 38   Filed 09/30/16   Page 35 of 36

1.02, 1.04, 3.02 and 4.02.  These and the other arguments raised in plaintiff's brief but not specifically discussed above have been considered and rejected as unfounded.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff was not disabled from his alleged onset date through the date of the ALJ's opinion.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 30, 2016